DOCKET NO. 15-14406-FF

# United States Court of Appeals
for the
# Eleventh Circuit

IAG LLC,

*Appellant,*

v.

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH PENNSYLVANIA,

*Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
IN CIVIL DOCKET FOR CASE #: 8:13-cv-01675-CEH-TBM
(Hon. Charlene Edwards Honeywell)

## BRIEF OF THE APPELLANT

STEVEN E. GOLDMAN, ESQ.
GOLDMAN & HELLMAN
800 S.E. 3rd Avenue, 4th Floor
Fort Lauderdale, Florida 33316
Tel (954) 356-0460
Cell (617) 784-1100
Fax (954) 832-0878

MICHAEL I. GOLDMAN, ESQ.
GOLDMAN & HELLMAN
233 Harvard St., Suite 211
Brookline, MA 02446
Tel (617) 566-4200
Cell (617) 320-9854
Fax (617) 566-4292

*Co-Counsel for National Union Fire Insurance Company
of Pittsburgh Pennsylvania*

# CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Circuit Rule 26.1-1, Appellant National Union Fire Insurance Company of Pittsburgh Pennsylvania certifies that, to the best of our knowledge, the following persons and entities have an interest in this appeal:

1.  American International Group, Inc. (NYSE: AIG)

2.  Becker, H. Paul, shareholder of IAG, LLC

3.  Chartis, Inc.

4.  Goldman, Michael I., Esq., Counsel for Defendant/Appellee

5.  Goldman, Steven E., Esq., Counsel for Defendant/Appellee

6.  Goldman & Hellman, Counsel for the Defendant/Appellee

7.  Honeywell, Judge Charlene Edwards, United States District Court Judge

8.  IAG, LLC, Plaintiff/Appellee

9.  National Union Fire Insurance Company of Pittsburgh Pennsylvania, Defendant/Appellee

10. Niemeyer, Michelle Melin, Counsel for the Plaintiff/Appellee

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Defendant/Appellee National Union Fire Insurance Company of Pittsburgh Pennsylvania makes the following statement as to corporate ownership:

Plaintiff/Appellee IAG, LLC is a privately held company, and is not a subsidiary of any other entity of which H. Paul Becker is the sole shareholder.

Defendant/Appellee National Union Fire Insurance Company of Pittsburgh Pennsylvania is a privately held subsidiary of Chartis, Inc., which is a privately held subsidiary of American International Group, Inc., which is a publically traded company on the New York Stock Exchange under the ticker symbol "AIG".

*IAG v. National Union Fire Insurance*
15-14406-FF

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant, National Union Fire Insurance Company of Pittsburgh, Pennsylvania requests oral argument.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT   -   -   -   ii

STATEMENT REGARDING ORAL ARGUMENT   -   -   -   iv

TABLE OF CONTENTS-   -   -   -   -   -   -   -   v

TABLE OF CITATIONS-   -   -   -   -   -   -   vii

STATEMENT OF JURISDICTION   -   -   -   -   -   xiii

STATEMENT OF THE ISSUES   -   -   -   -   -   -   1

STATEMENT OF THE CASE -   -   -   -   -   -   1

    1.  <u>Undisputed Facts</u>   -   -   -   -   -   2

    2.  <u>District Court's Errors and Distortions of Fact</u> -   -   -   13

SUMMARY OF THE ARGUMENT -   -   -   -   23

ARGUMENT   -   -   -   -   -   -   -   24

    1.  <u>"All Risk" Policies and the Burden of Showing Fortuity</u>   -   24

    2.  <u>The failure of the bilge pumps was the "but for"</u>
       <u>cause of the loss, but the proximate cause was the</u>
       <u>corrosion of cooling coil.</u> -   -   -   -   -   26

    3.  <u>Notwithstanding *Lamadrid*, there is no coverage for</u>
       <u>a loss caused by corrosion, no matter how quickly</u>
       <u>that corrosion occurs, because corrosion is a</u>
       <u>non-fortuitous cause of loss and is specifically excluded.</u> -   -   41

CONCLUSION   -   -   -   -   -   -   -   48

CERTIFICATE OF COMPLIANCE   -   -   -   -   -   51

*IAG v. National Union Fire Insurance*
15-14406-FF

CERTIFICATE OF SERVICE  -      -      -      -      -      -      -      52

*IAG v. National Union Fire Insurance*
15-14406-FF

# <u>TABLE OF CITATIONS</u>

<u>Cases – Supreme Court of the United States</u>
*Lanasa Fruit Steamship & Importing Co. v. Universal Ins. Co.*,
302 U.S. 556; 1938 A.M.C. 1 (1938)

*Queen Ins Co. v. Globe Ins. Co. (The Napoli)*,
263 U.S. 487, 493; 1924 A.M.C. 107 (1923)

*Standard Oil Co. v. United States*,
340 U.S. 54; 1951 A.M.C. 1 (1950)

*Wilburn Boat Co. v. Fireman's Fund Ins. Co.*,
348 U.S. 310 (1955)

<u>Cases – United States Courts of Appeal</u>
*Allen N. Spooner & Son, Inc. v. Connecticut Fire Insurance Co.*,
314 F.2d 753, 757; 1963 A.M.C. 859 (2nd Cir.1963)

*Atlantic Lines, Ltd. v. American Motorists Ins. Co.*,
547 F.2d 11 (2nd Cir.1976)

*** *Arkwright–Boston Mfrs. v. Wausau Paper Mills Co.*,
818 F.2d 591, 595 (7th Cir.1987)

*Banco Nacional de Nicaragua v. Argonaut Ins. Co.*,
681 F.2d 1337 (11th Cir.1982)

*Blaine Richards & Co. v. Marine Indem. Ins. Co.*,
635 F.2d 1051 (2nd Cir.1980)

*** *Central Int'l Co. v. Kemper Natl. Ins. Co.*,
202 F.3d 372; 2000 A.M.C. 751 (1st Cir.2002)

*** *Central Int'l Co. v. Kemper Natl. Ins. Co.*,
1999 WL 34826456 (1st Cir., Appellant's Brief.1999)

*Commodities Reserve Co. v. St. Paul Fire & Marine Ins. Co.*,
879 F.2d 640, 645; 1989 A.M.C. 2409 (9th Cir.1989)

*IAG v. National Union Fire Insurance*
15-14406-FF

*Goodman v. Fireman's Fund Ins. Co.*,
600 F.2d 1040; 1979 A.M.C. 2534 (4th Cir.1979)

*HIH Marine Services, Inc. v. Fraser*,
211 F.3d 1359; 2000 A.M.C. 1817 (11th Cir.2000)

*Intermetal Mexicana, S.A. v. Ins. Co. of North American*,
866 F.2d 71 (3rd Cir.1989)

*Jones v. Oklahoma City Public Schools*,
617 F.3d 1273 (10th Cir.2010)

*Knight v. Thompson*,
797 F.3d 934, 942 (11th Cir.2015)

\*\*\* *Lamadrid v. National Union Fire Ins. Co. of Pittsburgh, PA*,
567 Fed.Appx. 695 (11th Cir.2014)

*Maxwell v. KPMG LLC*,
520 F.3d 713 (7th Cir.2008)

*Mellon v. Fed. Ins. Co.*,
14 F.2d 997, 1002 (S.D.N.Y.1926)

*National Labor Relations Bd. v. Escambia River Elec. Coop., Inc.*,
733 F.2d 830 (11th Cir.1984)

*Northwestern Mut. Life Ins. Co. v. Linard*,
498 F.2d 556, 561 (2nd Cir.1974)

*Ope Shipping, Ltd. v. Allstate Ins. Co., Inc.*,
687 F.2d 639, 641-42; 1983 A.M.C. 22 (2nd Cir.1982)

*Pioneer Chlor Alkali Co. v. Nat'l Union Fire Ins. Co.*
*of Pittsburgh, Pa.*, 863 F.Supp. 1226, 1236 (D.Nev.1994)

*Rodriguez v. Taylor*,
569 F.2d 1231 (3rd Cir.1977)

*Rust Intern. Corp. v. Greystone Power Corp.*,

*IAG v. National Union Fire Insurance*
15-14406-FF

133 F.3d 1378 (11th Cir.1998)

\*\*\* *St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.*,
419 Fed.Appx. 946 (11th Cir.2011)

\*\*\* *Travelers Prop. Cas. Ins. Co. v. Peddle*,
158 Fed.Appx. 248 (11th Cir.2005)

*Tropical Marine Products, Inc. v.*
*Birmingham Fire Insurance Co. of Pennsylvania*,
247 F.2d 116, 121; 1957 A.M.C. 1946 (5th Cir.1957)

*United States v. Brown*,
415 F.3d 1257 (11th Cir.2005)

*United States v. Gonyer*,
761 F.3d 157 (1st Cir.2014)

*United States v. Palma*,
511 F.3d 1311 (11th Cir.2008)

*Youell v. Exxon Corp.*,
48 F.3d 105; 1995 A.M.C. 1147 (2nd Cir.1995)

<u>Cases – United States District Courts</u>
\*\*\* *Axis Reinsurance Co. v. Resmondo*,
2009 A.M.C. 2597 (M.D.Fla.2009)

\*\*\* *Central Int'l Co. v. Kemper Natl. Ins. Co.*,
1999 A.M.C. 1652, 1653 (D.Mass.1999)

*Continental Ins. Co. v. Lone Eagle Shipping (Liber.)*,
952 F.Supp. 1046; 1997 A.M.C. 1099 (S.D.N.Y.1997),
*aff'd*, 134 F.3d 103; 1998 AMC 964 (2nd Cir.1998)

*Great Lakes Reinsurance (UK) PLC v. Fortelni*,
33 F.Supp.3d 204 (E.D.N.Y.2014)

*Int'l Ship Repair v. St. Paul Fire and Marine Ins. Co.*,
944 F.Supp. 886; 1997 A.M.C. 1419 (M.D.Fla.1996)

\*\*\* *J & A Fleeting, Inc. v. Fireman's Fund*
*McGee Marine Underwriters*,
2006 A.M.C. 535 (E.D.Ky.2006)

\*\*\* *St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.*,
2009 WL 4855484 (S.D.Fla.2009)

\*\*\* *St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.*,
2008 A.M.C. 1617 (S.D.Fla.2008)

*Miller Marine Serve. v. Travelers Prop. Cas. Ins. Co.*,
2005 A.M.C. 2601 (E.D.N.Y.2005)

*Nuzzi v. St. George Comty. Consol. Sch. Dist. No. 258*,
688 F.Supp.2d 815 (C.D.Ill.2010)

*Precision Pine & Timber, Inc. v. United States*,
72 Fed.Cl. 460 (2006)

*Sipowicz v. Wimble*,
370 F.Supp. 442; 1975 A.M.C. 524 (S.D.N.Y.1974)

*Steele v. Stallion Rockies Ltd.*,
--- F.Supp.3d ----; 2015 WL 3396417 (D.Colo.2015)

Cases – State Courts
*Rodriguez-Escobar v. Goss*,
392 S.W.3d 109 (Tex.2013)

*Allison v. Seattle Housing Authority*,
799 P.3d 1195 (Wash.App.1999)

*Gerst v. Marshall*,
549 N.W.2d 810 (Iowa.1996)

*Gilbane Bldg. Co. v. The Altman Co.*,
2005 WL 534906, (Ohio.App.2005)

*Kitma As v. Royal Ins. Co.*,

*IAG v. National Union Fire Insurance*
15-14406-FF

9 P.3d 239; 2001 AMC 708 (Wn.App.2000)

*Latzel v. Bartek*,
846 N.W.2d 153 (Neb.2014)

*Mayes v. Bryan*,
139 Call.App.4[th] 1075 (Cal.2006)

*State v. Wilkinson*,
10 P.3d 634 (Ariz.2000)

*Thomas v. McKeever's Enters. Inc.*,
388 S.W.3d 206 (Mo.App.2012)

*** *Weber v. New Hampshire Ins. Co.*
480 So.2d 672; 1986 A.M.C. 2378 (Fla.App.1985)

<u>Cases – Foreign</u>
*Leyland Shipping Company v. Norwich Union Fire Ins. Soc.*,
1918 A.C. 350 (Lord Shaw, House of Lords.1918)

*Thames and Mersey Marine Ins. Co. v. Hamilton Fraser & Co.*,
12 App.Cas. 484 (House of Lords.1887)

<u>Legal Treatises</u>
Leslie J. Buglass, *Marine Insurance and General Average
in the United States: An Average Adjuster's
Point of View*, 3rd ed. (Cornell Maritime Press, 1991)

Buglass, Leslie J., *Marine Insurance and General Average*,
Cornell Maritime Press (1987)

*Couch on Insurance*, §99:27, 3rd ed.
(Thomson Reuters, 2015)

*Williston on Contracts*, §49:28, 4th ed.
(Thomson Reuters, 2015)

<u>Reference</u>
*Black's Law Dictionary*,

*IAG v. National Union Fire Insurance*
15-14406-FF

Thomson Reuters, 10th ed. (2014)

\*\*\* *Collins English Dictionary*,
HarperCollins (2004)

*Fowler's Modern English Usage*,
Clarendon Press (1996)

*The New Oxford American Dictionary*,
Oxford (2005)

*Shorter Oxford English Dictionary*,
Oxford (2002)

## <u>STATEMENT OF JURISDICTION</u>

The District Court properly exercised subject-matter jurisdiction over this matter under 28 U.S.C. §1333, as this is a dispute concerning a policy of marine insurance affording first-party property damage coverage to a yacht.

This Court has jurisdiction to hear interlocutory appeals from non-final orders in admiralty cases under 28 U.S.C. §1292(a)(3).

*IAG v. National Union Fire Insurance*
15-14406-FF

## **STATEMENT OF THE ISSUES**

1. The sinking of the vessel at its dock was proximately caused by the holes in the cooling coil which allowed water to enter the vessel, not the interruption of shoreside power to the bilge pumps.

2. There can be no coverage for a loss caused by corrosion because corrosion is not fortuitous and is specifically excluded from coverage, no matter how soon or how fast it may occur.

## **STATEMENT OF THE CASE**

Despite the District Court's numerous mistakes of fact detailed below, the undisputed facts are very simple: (1) Water entered the vessel through the holes in the air conditioning cooling coil caused by "erosion/impingement attack" after six years of use.  (2) "Erosion/impingement attack" is a form of corrosion and six years is a perfectly reasonable and expected time period for such holes to develop. (3) The water entering through the holes in the cooling coil was removed by the vessel's bilge pumps, whose capacity was greater than the flow of water and adequate to keep the vessel afloat.  (4) At some unknown time, it is alleged (and for purposes of summary judgment National Union did not contest) that the flow of shoreside electricity to the vessel was interrupted and the bilge pumps to drew electricity from the vessel's batteries.  (5) Eventually the batteries were depleted,

1

the bilge pumps ceased to remove water from the vessel, and water entering through the cooling coil caused the vessel to sink.

1. Undisputed Facts

The present appeal arises out of a policy of marine insurance issued by the Appellant, National Union Fire Insurance Company of Pittsburgh Pennsylvania (hereinafter "National Union") to the Appellee, IAG, LLC (hereinafter "IAG"), affording $1,000,000.00 in first party property damage coverage for the 2004 Carver Marquis vessel identified on the policy's declarations pages as the *It's All Good*. District Court's Summary Judgment Order, DE#104, p. 2. The policy afforded coverage against: "accidental, direct physical loss or damage, except as specifically excluded in this policy." Doc 50-1, p. 5. The policy specifically excluded from coverage loss or resulting damage from "a. wear and tear, gradual deterioration, weathering, insects, mold, animals or marine life... and f. corrosion, except electrolytic (stray current) corrosion." *Id*.

On August 13th, 2010, the *It's All Good* was found sunk at its dock. DE# 104, p. 2. Following IAG's report of the sinking, the vessel was examined by National Union's surveyor, Sam Techton (hereinafter "Techton"), on August 20th, August 23rd, August 26th, and September 17th, 2010. DE#50-4, DE#50-5, DE#50-

2

8, and DE#50-10, pp. 21-22.[1]  At this first examination, Techton observed that water entered the vessel through holes in the cooling coil of the vessel's air conditioner (hereinafter "the coil") and opined that the holes in the coil were caused by corrosion.  DE#50-4, p. 3, DE#50-10, pp. 37-40.  At the time that the holes developed, the coil was six years old.  DE#55, pp. 62-63.

The coil was examined by Techton again on September 30th, 2010.  DE#50-5.  Techton was joined in his examination by Dewey Ives (hereinafter "Ives"), a marine surveyor appointed by IAG.  DE#50-6, DE#50-7, pp. 20-21.  Techton's report confirmed his initial evaluation that the holes in the coil were caused by corrosion.  DE#50-5, p. 3.  At the same time, Ives stated in his report that the holes in the coil were caused by corrosion.  DE#50-6, p. 3.  Ives testified to the same thing at his deposition.  He testified that the holes in the coil were caused by corrosion and that the coil had been leaking for "an extended period of time... [p]robably more than six months."  DE50-7, pp. 38-40.

Techton and Ives examined the vessel again on October 14th, 2010.  As before, they both opined that the holes in the coil were caused by corrosion. DE#50-8, p. 2.

Following Techton's examination, National Union retained Nicholas Biery (hereinafter "Biery"), a metallurgist and engineer with a doctorate in "Materials

---

[1] Capt. Martin Embree participated in these initial examinations, but only to give an estimate as to the cost of repairs.  DE#52-4, p. 2.

Science & Engineering," to examine the coil and determine the cause of the holes. DE#55, p. 11, DE#55-3, p. 1. Biery examined the holes with an electron microscope and an energy dispersive spectrometer. DE#55, pp. 33-34. Biery stated in his report and testified at his deposition that the holes in the coil were caused by corrosion. DE#55, p. 58, DE#55-3, p. 9. Finally, Biery testified that six years is the perfectly reasonable and expected time period for the development of such holes. DE#55, pp. 62-63.

Based on Biery's analysis and his own observations, Techton concluded that the sinking was caused by the intrusion of water through the corroded coil. DE#50-4, p. 3.

Ives, IAG's surveyor, concluded that the failure of the vessel's bilge pumps was a significant factor in causing the vessel to sink. DE#50-7, p. 47. Nonetheless, Ives concluded that the more significant factor was the holes in the coil caused by corrosion. DE#50-7, p. 47, DE#50-9, p. 5. Ives stated at his deposition, "The more significant factor would be how did the water get in the boat, as far as cause of loss. A bilge pump can't sink a boat, I don't think." *Id.*

Since both sides' experts were initially in complete agreement that the holes in the coil were caused by corrosion and that the holes in the coil were the proximate cause of the loss, IAG retained a new set of witnesses three years later,

Steven Hebert (hereinafter "Hebert"), Orion Keifer (hereinafter "Keifer"), and Peter Layson (hereinafter "Layson").

First, Keifer and Layson observed holes in both the inner and outer tubing of the coil. However, they initially said absolutely nothing about the holes in the inner tube of the coil. DE#50-12 and DE#50-13. When specifically asked, Keifer, who is a metallurgist, testified that he could render no opinion as to the cause of the holes in the inner tube of the coil. DE#50-13, p. 12. Keifer testified that the inner holes occurred first and that water spraying through the inner holes caused the holes in the outer tube of the coil. DE#50-13, p. 17. Keifer further testified that the rate of water ingress into the hull was less than the capacity of the vessel's bilge pumps and that something must have prevented the bilge pumps from removing the water. DE#50-13, p. 42. Layson, who has only a college degree in physics, gave no opinion whatsoever as to the cause of the holes in the inner or outer tubing. DE#50-12. He could only say that the vessel's bilge pump system failed because there was insufficient power. DE#50-12, p. 41.

Finally, the coil was examined by Hebert. DE#50-14. It is essential to pause here and note one dispositive, undisputed fact which for some reason was omitted from the District Court's summary judgment order. At the time when both parties moved for summary judgment, IAG's experts, Keifer and Layson, had previously testified that they could render no opinion as to the cause of the holes in

5

the inner tubing of the air conditioning cooling coil and the undisputed evidence from National Union's experts indicated that those holes in the inner tube of the cooling coil were caused by corrosion. DE#50, pp. 4-5, DE#50-12, DE#50-13, pp. 12 and 17. However, in order to oppose National Union's motion for summary judgment, IAG presented contradictory affidavits from both Keifer and Layson changing their testimony and declaring that the holes in the inner tube were caused by "erosion/impingement attack." DE#73-1, p. 3, DE#73-2, p. 2.[2] Nowhere in their depositions or their new affidavits do they explain what "erosion/impingement attack" really is. *Id*. Fortunately, there is undisputed expert testimony explaining that "erosion/impingement attack" is simply a phrase which means "corrosion."

---

[2] Of course, should this matter have to go to trial, none of the expert opinions offered by Keifer and Layson regarding "erosion/impingement attack" will be admissible because their evidence fails to meet the *Daubert* standard that their methodology be sufficiently reliable. *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir.2005). Keifer and Layson cannot satisfy the *Daubert* standard because, by their own admission, they applied no method whatsoever. This is clear from their affidavits. Both their affidavits state that their "investigation was insufficient to determine with certainty the cause," that "further metallurgical examination" would be required to "reach a definitive conclusion," and "that with the current level of investigation, the cause was indeterminate precisely because ***the investigation was not complete***." By their own admission, their investigation was "incomplete," it was "insufficient" to determine the cause of the holes, and a conclusion could not be reached without a "further metallurgical examination" which they did not conduct. Biery, the expert appointed by National Union, is a metallurgist and he performed the exact analysis which Keifer and Layson failed to do. DE#55, pp. 58 and 62-63, DE#55-3, p. 9. Based on that analysis, he gave his opinion that the holes were caused by corrosion. *Id*. Besides failing to meet the *Daubert* standard, "affidavits, when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment." *Nuzzi v. St. George Comty. Consol. Sch. Dist. No. 258*, 688 F.Supp.2d 815, 831 (C.D.Ill.2010). However, for the reasons stated above, National Union elected not to challenge these facially defective affidavits on summary judgment because "erosion/impingement attack" is a form of corrosion which is not fortuitous and which is specifically excluded from coverage. *See cases cited infra*.

Hebert, an electrical engineer, testified that "what most likely caused the damage to the air conditioning coil is impingement attack." DE#50-14, p. 21. Helpfully, he explained that:

> A. Impingement attack is a type of corrosion that occurs when you have very high velocity water flow or disturbed water flow through piping which can strip protective oxides that form on metals naturally in seawater. Once those protective oxides are stripped then the metal becomes much more prone to corrosion damage.
> Q. Okay. It's a form of corrosion; is it not?
> A. It is. DE#50-14, p. 21.

In response to counsel's questions, Hebert repeated again and again that "erosion/impingement attack" is a form of corrosion.

> Q: Ok. It's a form of corrosion, is it not?
> A: It is.
> ...
> Q: Again, we don't have any dispute here. You have conceded that there was corrosion that occurred over some lengthy period of time and that was the cause of the ingress of water?
> MS. NIEMEYER: Object to the form. You're pointing at pictures of the fan housing and the outside exterior part, which isn't what caused the ingress of the water. It's very misleading the way you're asking the question.
> A: I agree, there is corrosion to the air conditioning system that occurred over a period of time.
> Q: And that's where the water comes in; correct?
> A: That is where the water enters the vessel.
> Q: Okay. In fact, you say in your report: It is acknowledged that this was the source of water ingress; correct?
> A: Correct.
> Q: Referring to the corrosion that you just testified to?

7

A: Referring to --

MS. NIEMEYER: Objection to the form.

A: -- the air conditioning coil.

Q: Referring to the corrosion on the air conditioning coil; correct?

MS. NIEMEYER: Objection to form.

A: ***There is corrosion on the air conditioning coil. That is where the water came in. That is correct.*** DE#50-14, pp. 25-26 [emphasis added].

Biery also gave undisputed testimony explaining exactly what "erosion/impingement attack" really is. Biery testified:

> When we have erosion corrosion, which would be a possible mechanism in a tubing failure when you have high flow rates, you can get a corrosion mechanism erosion corrosion... ***So erosion corrosion or impingement attack is sometimes how it's referred to in the marine industry and other industries*** is where you have a high velocity flow of water. Some metals are corrosion resistant because they form a nice, adherent oxide. It doesn't wash away. Chromium is like this. The reason why we chrome plate bumpers is it creates a very thin chromium oxide layer. It doesn't wash away and the chrome stays bright and shiny looking for a long time. With copper, we form some complex oxides and hydroxides on the surface, and they're fairly soft. So what can happen is if flow rates are too high, it will erode those soft deposits that are protecting the underlying copper from the fluid, and you'll get attack in those area where flow is high. When that happens, you get a very characteristic form of damage where you get usually horseshoe-shaped pits and a stippled or rippled surface. So you don't get a broad, shallow, knife-edged hole. You get attack where the corroded surface will be bumpy and irregular. DE#55, pp. 53-55 [emphasis added].

8

Furthermore, this Court can take judicial notice under Fed.R.Evid. 201(b) that the *Collins English Dictionary* defines "impingement attack" as "a form of corrosion of metals caused by erosion of the oxide layer by a moving fluid in which there are suspended particles or air bubbles." *Collins English Dictionary*, HarperCollins (2004).

This undisputed evidence establishes that, whatever name IAG's experts elect to use, the holes in the air conditioning cooling coil were caused by corrosion. Why the District Court elected to omit this undisputed evidence from its decision is mysterious, especially in light of this Court's own decision affirming that, even where an insured may attempt to attribute a loss to "erosion" instead of "corrosion," the loss is still not fortuitous and is also specifically excluded from coverage. *Travelers Prop. Cas. Ins. Co. v. Peddle*, 158 Fed.Appx. 248 (11th Cir.2005). Hereinafter, all further references to the holes in the coil will use the word "corrosion," rather than "erosion/impingement attack," unless directly quoting a document or deposition.

Finally, the experts retained by IAG asserted that, in order to explain the sinking of the vessel, there must have been an "interruption of shoreside power" to the vessel's bilge pumps.[3] In particular, Hebert made clear "that the leak in the air

---

[3] In another one of the District Court's factual misstatements, it is important to note that nowhere was there any evidence identifying the cause of this "interruption." No evidence was presented that the "interruption" was caused by a blackout, a blown fuse, vandalism, the insured's lack of due diligence, or any one of a hundred other possible causes. Yet, this "interruption" was somehow transmuted into a "power outage" by the District Court. An "outage"

*IAG v. National Union Fire Insurance*
15-14406-FF

conditioning coil was the point of water ingress, but not the only necessary thing to occur to make the vessel sink." DE#50-14, p. 20. Since both the corrosion of the coil and the failure of the bilge pumps were both necessary for the sinking to occur, Hebert concluded that the failure of the bilge pumps was the cause of the loss because "***it was the last event in time***" and the bilge pumps could have contained the leak. DE#50-14, p. 30. Hebert was then specifically asked, "So, if the vessel's bilge pump system had been functional on the date of the incident; your opinion is that the vessel ***would not have*** sunk?" DE#50-14, p. 31. Hebert answered, "That's absolutely true." DE#50-14, p. 31.

The phrase "would not have" is synonymous with "but for" causation. *Rodriguez–Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex.2013), *Gerst v. Marshall*, 549 N.W.2d 810, 815 (Iowa.1996), *Mayes v. Bryan*, 139 Cal.App.4th 1075, 1096 (Cal.2006). "The 'but for test' for causation provides that the defendant's conduct is a cause of the event if the event ***would not have*** occurred 'but for' that conduct." *Thomas v. McKeever's Enters. Inc.*, 388 S.W.3d 206, 212 (Mo.App.2012).

---

is defined as "a period when a power supply or other service is not available." *The New Oxford American Dictionary*, Oxford (2005). IAG, the party with the burden of proof, presented no evidence that power for the vessel was unavailable. Caselaw shows that the phrase "power outage" refers to a circumstance in which the utility providing electrical power fails to so provide. *United States v. Palma*, 511 F.3d 1311 (11th Cir.2008) (hurricane), *Rust Intern. Corp. v. Greystone Power Corp.*, 133 F.3d 1378 (11th Cir. 1998) (defective mechanism), *National Labor Relations Bd. v. Escambia River Elec. Coop., Inc.*, 733 F.2d 830 (11th Cir.1984) (pre-planned). Therefore, contrary to the District Court's assertion, there was no evidence of a "power outage." For purposes of summary judgment, all that was established was that there was an interruption of shoreside power whose cause IAG, the party with the burden of proof, did not investigate.

*IAG v. National Union Fire Insurance*
15-14406-FF

Hebert's report states the same thing, that the failure of the bilge pumps was the cause of the loss because the corroded holes in the coil "could not have caused the partial submersion of the vessel ***had there been*** sufficient power to operate the bilge pumping system."   DE#50-16, p. 12.   The phrase "had there been" is synonymous with "but for" causation.  *United States v. Gonyer*, 761 F.3d 157, footnote 7 (1st Cir.2014), *Rodriguez v. Taylor*, 569 F.2d 1231, 1238 (3rd Cir.1977), *Precision Pine & Timber, Inc. v. United States*, 72 Fed.Cl. 460, 498 (2006), *State v. Wilkinson*, 10 P.3d 634, 638 (App.2000), *Allison v. Seattle Housing Authority*, 799 P.2d 1195, 1197 (Wash.App.1990).

In support of this conclusion as to causation, IAG's witnesses were adamant that the sinking would not have occurred if there had been no interruption of shoreside power.  The District Court repeated this essential fact multiple times:

- "The vessel would not have sunk ***but for*** the failure of the bilge pumps." Doc 104, p. 3.

- The holes in the air conditioning coil presented no "risk of sinking the boat ***as long as*** the bilge pumps were operational."  *Id*, at 7.

- The failure of the bilge pumps was "***the last event in time***" before the sinking.  *Id*, at p. 9.

11

*IAG v. National Union Fire Insurance*
15-14406-FF

- The vessel would not have been at risk of sinking "***as long as*** the bilge pumps were operational." *Id*, at 17.[4]

- "The vessel would not have sunk ***but for*** the failure of the bilge pumps." *Id*.

As a matter of simple logic, these statements establish only that the interruption of shoreside power was a necessary condition for the sinking. A "necessary condition" is merely a "but for" cause and is not a "proximate cause." *Maxwell v. KPMG LLC*, 520 F.3d 713, 716 (7th Cir.2008), *Latzel v. Bartek*, 846 N.W.2d 153, 166 (Neb.2014). The District Court confused "proximate" cause with "but for" cause and concluded that the sinking of the *It's All Good* was proximately caused by the failure of the bilge pumps because it was the "but for" cause of the loss. "[I]f the bilge pumps had not failed, the boat would not have sunk." *Id*, at 19.

Therefore, the undisputed facts of the loss can be summarized as follows: (1) Water entered the vessel through holes in the corroded coil which was six years old. DE#50-4, p. 3, DE#50-5, p. 3, DE#50-10, pp. 37-40, DE#50-14, p. 20. (2) Such a failure after six years is not premature, but is a perfectly reasonable and expected time period for such holes to develop. DE#55, pp. 54-55 and 62-63. (3)

---

[4] The phrase, "as long as" identifies a necessary condition and is merely a more nuanced form of "but for" causation. *Steele v. Stallion Rockies Ltd*, --- F.Supp.3d ----; 2015 WL 3396417 (D.Colo.2015), *citing*, *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273 (10th Cir.2010). *The New Oxford American Dictionary*, Oxford (2005). "As long as" means "provided that, only if." *Shorter Oxford English Dictionary*, Oxford (2002), *Fowler's Modern English Usage*, Clarendon Press (1996).

The water entering through the corroded coil was removed by the vessel's bilge pumps, whose capacity was greater than the flow of water and adequate to keep the vessel afloat. DE#50-16, pp. 20 and 30. (4) At some unknown time, the flow of shoreside electricity to the vessel was interrupted, causing the bilge pumps to draw electricity from the vessel's batteries. DE#50-16, p. 48. (5) Eventually the batteries were depleted, the bilge pumps ceased to remove water from the vessel, and water entering through the cooling coil caused the vessel to sink. DE#50-16, p. 48. As specifically found by the District Court, "The vessel would not have sunk ***but for*** the failure of the bilge pumps to remove water from the vessel. DE#104, p. 3 and p. 17. [emphasis added]. The District Court further explained, "Because the holes [in the coil] were so small, they would not present a risk of sinking the boat ***as long as***, the bilge pumps were operational." *Id*, at 7 and 17 [emphasis added].

### 2. <u>District Court's Errors and Distortions of Fact</u>

The District Court's decision contains at least three serious factual errors which reveal that the District Court was badly confused as to the cause of the holes in the coil and as to the timeline of events leading up to the loss. A district court's

factual determinations are reviewed for clear error. *Knight v. Thompson*, 797 F.3d

934, 942 (11th Cir.2015).[5]

The District Court made these three clear factual errors:

1. The District Court confused the vessel's sump pump (which was inoperable due to wear and tear long before the loss) with the vessel's bilge pumps.

2. The District Court mistakenly declared that the corrosion which caused the holes in the coil occurred earlier than expected.

3. The District Court mistakenly declared that it is uncommon for a coil to fail after six years.

As specifically found by the District Court, "The vessel would not have sunk **_but for_** the failure of the bilge pumps to remove water from the vessel."  DE#104, p. 3 and p. 17 [emphasis added].  The District Court further explained, "Because the holes [in the coil] were so small, they would not present a risk of sinking the boat **_as long as_**, the bilge pumps were operational."  *Id*, at 7 and 17 [emphasis added].

Under this theory of the loss, which neither party disputed for purposes of summary judgment, the failure of the bilge pumps was the last event in time before the loss and the loss would not have occurred "but for" the failure of the bilge

---

[5] Just to be clear, it is most definitely not National Union's contention that there are disputes of fact.  Rather, it is National Union's contention that the District Court committed clear error in its understanding and recitation of the undisputed facts.

pumps. DE#50-16, pp. 20 and 30. Nonetheless, the failure of the bilge pumps played no role in causing the entrance of water through the coil, in causing water to back up into the air conditioning unit, nor in causing the corrosion of the coil. On the contrary, the water had been coming in through the corroded coil for some long, but indeterminate period of time, as long as six months before the sinking, and such corrosion is reasonable and expected after six years. DE#55, pp. 58, 62-63. The failure of the bilge pumps was caused by the entirely separate and totally unrelated interruption of shoreside power. DE#50-16, p. 12. The two concurrent causes undoubtedly overlapped in time and were both necessary to bring about the loss (DE#50-16, pp. 20 and 30), but the failure of the bilge pumps occurred long after the holes in the corroded coil and played no role whatsoever in backing up water into the air conditioning unit or in causing the corrosion of the coil. DE#50-16, p. 12.

Nevertheless, the District Court declared that "the failure of the bilge pumps exacerbated the issues with the air conditioning cooling coil by causing water to back up into the air conditioning unit." DE#104, p. 18. Unfortunately, the District Court's statement includes no citation to the record, so it is hard to know with certainty the source for this assertion. However, a close examination of the record reveals that the District Court was confused by the difference between the vessel's bilge pumps and the vessel's inoperable sump pump. This mistake, confusing the

15

*IAG v. National Union Fire Insurance*
15-14406-FF

sump pump with the bilge pumps, caused the District Court to make a critical error

regarding the undisputed chain of causation.

According to Ives, what actually happened with the sump pump is this: the

sump pump was inoperable when the vessel sunk and had been inoperable for

some time.  DE#50-7, p. 36.  IAG's metallurgist, Hebert, agreed that the sump

pump was inoperable due to wear and tear.  DE#50-14, p. 28.  Ives testified that,

without an operable sump pump to remove condensation from the air conditioner,

water backed up into the air conditioner condensation tray and splashed the coil.

DE#50-7, p. 65.  The presence of salt water caused the coil to corrode and water

entered the vessel through the corroded holes.  DE#50-7, p. 65.  Losses caused by

corrosion (the coil) or by wear and tear (the inoperable sump pump) are not

fortuitous and are specifically excluded from coverage.  *Goodman v. Fireman's*

*Fund Ins. Co.*, 600 F.2d 1040, 1042; 1979 A.M.C. 2534 (4th Cir.1979), *Axis*

*Reinsurance Co. v. Resmondo*, 2009 A.M.C. 2597, 2601 (M.D.Fla.2009), *Sipowicz*

*v. Wimble*, 370 F.Supp. 442, 446; 1975 A.M.C. 524 (S.D.N.Y.1974).  However,

this theory of the loss was disputed by IAG.  IAG's metallurgist, Hebert, agreed

that the sump pump was inoperable due to wear and tear.  DE#50-14, p. 28

However, Keifer, Layson, and Hebert contend that the holes in the coil were

caused by "erosion/impingement attack" (read: "corrosion") and that the

inoperable sump pump played no role whatsoever in either causing the holes in the

16

coil or in failing to prevent the sinking. DE#51. Because a dispute of material fact would preclude summary judgment for either party, National Union elected to accept the theory of IAG's witnesses solely for purposes of summary judgment and to rely on the evidence that "erosion/impingement attack" is merely another word for corrosion and the caselaw holding that "erosion/impingement attack" is not fortuitous and that it falls within the policy's corrosion exclusion. DE#71. Therefore, strictly for purposes of summary judgment, there was no dispute that the sump pump, which was inoperable due to wear and tear, played no role in the loss.[6]

The District Court made a clear error by confusing the sump pump with the bilge pumps. As a result, the District Court believed that the failure of the bilge pumps "exacerbated" the failure of the air conditioning cooling coil. DE#104, p. 18. As demonstrated above, this is plainly not so.

Therefore, the proper facts, undisputed for purposes of summary judgment, are these: (1) Water entered the vessel through the holes in the air conditioning cooling caused by corrosion after six years of use. DE#50-4, p. 3, DE#50-5, p. 3, DE#50-10, pp. 37-40, DE#50-14, p. 20. (2) Six years is a perfectly reasonable and expected time period for such holes to develop. DE#55, pp. 54-55 and 62-63. (3) The water entering through the holes in the corroded coil was removed by the

---

[6] Of course, if the District Court really was convinced that the sump pump caused the loss, then the District Court should have entered judgment for National Union because the undisputed evidence is that the sump pump failed due to wear and tear. Wear and tear is not fortuitous and is excluded from coverage. *See cases cited supra.*

vessel's bilge pumps, whose capacity was greater than the flow of water and adequate to keep the vessel afloat.  DE#50-16, pp. 20 and 30.  (4) At some unknown time, the flow of shoreside electricity to the vessel was interrupted, causing the bilge pumps to draw electricity from the vessel's batteries.  DE#50-16, p. 48.  The failure of the bilge pumps did not exacerbate the holes in the air conditioning cooling coil, nor did it play any role in causing the holes in the air conditioning cooling coil.  (5) Eventually the batteries were depleted, the bilge pumps ceased to remove water from the vessel, and water entering through the corroded coil sunk the vessel.  DE#50-16, p. 48.

The failure of the bilge pumps was a separate event which was merely the last event to occur.  DE#50-16, pp. 20 and 30.  "The vessel would not have sunk ***but for*** the failure of the bilge pumps to remove water from the vessel.  DE#104, p. 3 and p. 17. [emphasis added].  The District Court further explained, "Because the holes [in the coil] were so small, they would not present a risk of sinking the boat ***as long as***, the bilge pumps were operational." *Id*, at 7 and 17 [emphasis added].

Based in part on this clear factual error (confusing the sump pump with the bilge pumps), the District Court mistakenly believed that the failure of the bilge pumps occurred first, playing a role in causing the holes in the cooling coil, and concluded that the failure of the bilge pumps was the proximate cause of the sinking.  DE#104, p. 18.  This is a clear mistake of fact.

The District Court's second clear error is this: in an attempt to shape the facts of the present matter to fit the *Lamadrid* mold, the District Court's opinion claims that there is evidence that the holes in the cooling coil occurred earlier than might be expected. DE#104, p. 14. In the *Lamadrid* case, which will be analyzed more thoroughly below, this Court held that the totally unexplained failure of a valve was fortuitous because it occurred prematurely, only 750 hours into the valve's expected lifespan of 2,500 to 3,500 hours. *Lamadrid v. National Union Fire Ins. Co. of Pittsburgh, PA*, 567 Fed.Appx. 695, 701 (11th Cir.2014). According to the District Court, the basis for this assertion that the coil failed prematurely is the statement in Keifer's affidavit that "the age of the subject A/C condenser coil at failure was substantially less than is consistently achieved by normal wear and tear." DE#73-1, p. 3.

The problem with the District Court's reliance in this statement is that the holes in the cooling coil were caused by corrosion (which IAG's witnesses insist on calling "erosion/impingement attack"), not wear and tear. DE#50-14, p. 21, DE#73-1, p. 3, DE#73-2, p. 2. No witness has asserted that the holes in the cooling coil were caused by wear and tear, normal or otherwise. *Id.* On the contrary, Keifer's deposition testimony and affidavit both state that the holes in the cooling coil were caused by "erosion/impingement attack," which is a form of corrosion. *Id.* Keifer's affidavit states, "It is my opinion that the likely cause of

the penetrations in the inner tube is erosion/impingement attack." DE#73-1, p. 3.

Keifer repeated the same thing multiple times during his deposition. "The outer

hole was, in my opinion, due to erosion." DE#50-13, p. 12. Further describing the

holes, Keifer was adamant, "This is not wear and tear. This is erosion." *Id*, at 17.

Therefore, it is utterly irrelevant that the age of the coil at the time of failure was

less than would be expected for a failure due to normal wear and tear. In order to

apply the *Lamadrid* standard, the relevant inquiry would be this: was the age of the

coil less than would be expected for a failure due to the corrosion?

Keifer was asked this exact question at his deposition and was very specific

in his testimony that he could give no opinion whatsoever as to whether the

"erosion/impingement attack" of the coil occurred earlier than might be expected:

> Q. Over what period of time did this erosion take place
> such that it finally permitted seawater to enter that
> vessel?
> A. I have done no testing on that.
> Q. So you have no opinion on that.
> A. I do not, no. *Id*, at 13.
> ...
> Q. [Erosion is a] process that requires time, correct?
> A. It is a process that requires time, correct.
> Q. And you have -- you didn't do testing with respect to
> what you've referenced as erosion in this case.
> A. I did not do any testing to determine how quickly that
> would occur in this particular case.
> Q. So assuming that the condition of the coil that you
> examined is due to erosion, you have no opinion with
> respect to how long that erosion might have been going
> on before it permitted seawater to intrude into the vessel;
> is that correct?

> A. I'm not going to speculate on that because I have not
> done testing to determine that.
> Q. So your refusal to speculate means you have no
> opinion that you're willing to state on the record, correct?
> A. At this particular time, that is correct. *Id*, at 14-15.

Keifer clearly stated, "I did not do any testing to determine how quickly that [erosion] would occur in this particular case." *Id*, at 13. He expressed no opinion whatsoever as to how long a cooling coil might be expected to last before suffering "erosion/impingement attack" or whether the holes from "erosion/impingement attack" occurred prematurely. Keifer could not give any testimony on this point because he did not do any testing, an essential prerequisite for the admission of any expert opinion. *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir.2005). Therefore, it's a non sequitur for the District Court to assert that the holes occurred sooner than might be expected from wear and tear. Wear and tear, premature or otherwise, is utterly irrelevant because all the parties agree that the holes in the coil were not caused by wear and tear. Keifer was very specific on this point. He explained that the holes in the coil were caused by corrosion, which he calls "erosion/impingement attack." *Id*.

If the District Court were searching for evidence to satisfy the prematurity standard of *Lamadrid*, the proper inquiry would have been this: was the corrosion of the coil premature? In answer to this question, the evidence is undisputed that there was nothing at all premature about the development of holes in the coil

21

caused by corrosion occurring after six years.  DE#50-14, p. 21, DE#73-1, p. 3, DE#73-2, p. 2.  While Keifer insisted that six years was premature for wear and tear, he was just as insistent that the holes were not caused by wear and tear. DE#50-13, p. 17.  He insisted that the holes were caused by "erosion/impingement attack" and was adamant that he could give no opinion as to the expected period of time required for such holes to develop.  *Id.*  Contrary to the District Court's assertion, the undisputed evidence shows that there was nothing whatsoever premature about the development of the holes by corrosion.  Therefore, even if this Court were to apply the *Lamadrid* standard, analyzed *infra*, Keifer's testimony cannot satisfy that standard.

The District Court's third clear error is this: in a further attempt to make the facts of this case align with the facts of the *Lamadrid* case, the District Court's opinion asserts as fact, based on the testimony of Biery, that holes in an air conditioning cooling coil are not a "common failure" for a six year old air conditioning unit.  DE#104, p. 14.  However, this is actually the opposite of Biery's testimony.  The relevant passage from Biery's deposition states:

> Q: Would you be surprised if I told you it was a six-year-old air-conditioning unit?
> A. No.
> Q. Is this a common failure of a six-year-old air-conditioning units?
> A. I don't think – I'm not familiar with any common failures of six-year-old air-conditioner units.  Usually if we have a design problem, we'll see it very quickly.  And

for a general corrosion problem, we'll see it when they're quite old or if they're not run properly or there are other issues. This is something that occurs over time. ***You know, taking six years to occur is not too surprising.*** It will also start occurring as debris builds up in the system. Probably due to either restrictions in flow, if there are restrictions in flow, or maybe it's just got low flow to start. ***It takes time, and six years is not an unreasonable amount of time for it to occur.*** DE#72, pp. 62-63 [emphasis added].

The quotation of this passage should suffice to prove that Biery's actual testimony was the exact opposite of what the District Court claimed. *Id*. Biery testified that the holes in the coil occurred too late to be a design defect and that it is unsurprising and perfectly reasonable that holes should develop in the coil after six years of use. *Id*.

Contrary to the District Court's mistakes of fact, there is no evidence at all which satisfies the *Lamadrid* standard, analyzed *infra*. IAG's witnesses presented no evidence showing how long a cooling coil might be expected to resist corrosion, which they call "erosion/impingement attack." Keifer specifically refused to give any such evidence at his deposition. DE#50-13, pp. 13-15. The only undisputed evidence as to the age of the cooling coil and it's expected rate of failure is that offered by Biery, who testified that corrosion after six years was reasonable and unsurprising. DE#55, pp. 62-63

Therefore, even though it is National Union's contention that the prematurity test from *Lamadrid* is not the applicable test of fortuity in this case, the correct

23

*IAG v. National Union Fire Insurance*
15-14406-FF

statement of undisputed facts shows that, even if the *Lamadrid* test were applied, there is no evidence which satisfies that standard. The District Court committed clear error when it determined that the air conditioning cooling coil failed prematurely.

## SUMMARY OF THE ARGUMENT

First, the failure of the bilge pumps was the "but for" cause of the loss, but the loss was proximately caused by the corrosion of the coil which allowed water to enter the vessel. Second, a loss proximately caused by corrosion is not covered because corrosion is a non-fortuitous cause of loss and is specifically excluded from coverage.

## ARGUMENT

1. Applicable Law, Burden of Proof, and Standard of Review

Contracts of marine insurance are governed by the entrenched principles of substantive federal admiralty law. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310 (1955). However, where no such entrenched principle exists, contracts of marine insurance are governed by state law. *Id.*

"Ordinary marine insurance covers losses due to fortuitous perils of the sea." *Standard Oil Co. v. United States*, 340 U.S. 54, 58 n. 9; 1951 A.M.C. 1 (1950). "[T]he fortuity rule is indeed a creature of federal law. Federal courts sitting in admiralty have been applying some variation of the fortuity rule in marine

insurance cases for over a hundred years." *Youell v. Exxon Corp.*, 48 F.3d 105;

1995 A.M.C. 1147 (2nd Cir.1995). Under federal admiralty law and Florida law,

recovery under a policy of marine insurance requires that the insured first carry the

burden of showing that the loss was proximately caused by a fortuitous event.

*Banco Nacional de Nicaragua v. Argonaut Ins. Co.*, 681 F.2d 1337 (11th Cir.1982),

*Atlantic Lines, Ltd. v. American Motorists Ins. Co.*, 547 F.2d 11 (2nd Cir.1976),

*Int'l Ship Repair v. St. Paul Fire and Marine Ins. Co.*, 944 F.Supp. 886, 892; 1997

A.M.C. 1419 (M.D.Fla.1996). After the insured has first presented such evidence,

the factual burden shifts to the insurer to show that coverage for the loss is

specifically excluded. *Id.* No burden shifts to the insurer to prove the applicability

of an exclusion until after the insured first presents evidence that the loss was

caused by a fortuitous event. *Id.* Losses caused by non-fortuitous events are not

covered, even if they are not specifically excluded. *Mellon v. Fed. Ins. Co.*, 14

F.2d 997, 1002; 1926 A.M.C. 1449 (S.D.N.Y.1926).

Where the facts are undisputed, determining whether the cause of the loss

was fortuitous is a question of law for the court to decide. *Intermetal Mexicana,*

*S.A. v. Ins. Co. of North American*, 866 F.2d 71, 77 (3rd Cir.1989), *Great Lakes*

*Reinsurance (UK) PLC v. Fortelni*, 33 F.Supp.3d 204 (E.D.N.Y.2014), *Mellon v.*

*Federal Ins. Co.*, 14 F.2d 997; 1926 A.M.C. 1449. "When two or more causes

combine to cause a loss, one of which is insured against while the other is not, the

*IAG v. National Union Fire Insurance*
15-14406-FF

loss is not insured unless the covered cause is the predominant efficient cause of the loss." *Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042; 1979 A.M.C. 2534. Where the facts of the loss are undisputed, and the only dispute between the parties is which cause of loss should be labeled the "proximate" cause, "proximate cause can be settled as a matter of law." *Commodities Reserve Co. v. St. Paul Fire & Marine Ins. Co.*, 879 F.2d 640, 645; 1989 A.M.C. 2409 (9th Cir.1989). *See also*, *Central Int'l Co. v. Kemper Natl. Ins. Co.*, 202 F.3d 372; 2000 A.M.C. 751 (1st Cir.2002), *Ope Shipping, Ltd. v. Allstate Ins. Co., Inc.*, 687 F.2d 639, 641-42; 1983 A.M.C. 22 (2nd Cir.1982).

A district court's legal conclusions with respect to the coverage afforded by a contract of marine insurance are subject to *de novo* review. *HIH Marine Services, Inc. v. Fraser*, 211 F.3d 1359; 2000 A.M.C. 1817 (11th Cir.2000).

2. The failure of the bilge pumps was the "but for" cause of the loss, but the proximate cause was the corrosion of cooling coil.

The District Court's decision, that the loss of the vessel was proximately caused by the failure of the bilge pumps, is erroneous because the District Court confused proximate cause with "but for" cause. In disputes involving policies of marine insurance, courts are to reach their decisions by looking to the "predominant or determining" or "real efficient" cause of the loss. *Blaine Richards & Co. v. Marine Indem. Ins. Co.*, 635 F.2d 1051 (2nd Cir.1980). "It must be remembered that when there are two concurrent causes of a loss, the

26

predominant efficient one must be regarded as the proximate cause when the damage caused by each cannot be distinguished or segregated." Leslie J. Buglass, *Marine Insurance and General Average*, p. 410 (Cornell Maritime Press, 1987). The caselaw uniformly holds that proximate cause is more than mere "but for" cause and that, "[w]here there is more than one potential cause, courts should not necessarily find that the 'single cause nearest to the loss in time' is the proximate cause. Indeed the Supreme Court has noted that 'proximate cause is the efficient cause and not a merely incidental cause which may be nearer in time to the result.'" *Continental Ins. Co. v. Lone Eagle Shipping (Liber.)*, 952 F.Supp. 1046; 1997 A.M.C. 1099 (S.D.N.Y.1997), *aff'd*, 134 F.3d 103; 1998 AMC 964 (2nd Cir.1998), citing *Lanasa Fruit Steamship & Importing Co. v. Universal Ins. Co.*, 302 U.S. 556 (1938). Thus, in marine insurance coverage litigation, proximate cause is not determined by resort to "but for" causation. *Miller Marine Serve. v. Travelers Prop. Cas. Ins. Co.*, 2005 A.M.C. 2601 (E.D.N.Y.2005).[7]

Despite this clear caselaw, the District Court's decision rests solely on the assertion that the failure of the vessel's bilge pumps was the proximate cause of the loss because it was the "last event in time" before the sinking and was the "but for" cause of the loss. DE#104, pp. 3, 7, 9, and p. 17. Again and again, the District

---

[7] "To treat *proxima causa* as the cause which is nearest in time is out of the question." *Leyland Shipping Company v. Norwich Union Fire Ins. Soc.*, 1918 A.C. 350 (Lord Shaw, House of Lords). *See also*, *Queen Ins. Co. v. Globe Ins. Co. (The Napoli)*, 263 U.S. 487, 493; 1924 A.M.C. 107 (J. Holmes.1923)("There are special reasons for keeping in harmony with the marine insurance laws of England, the great field of this business[.])

Court identified the failure of the bilge pumps as the "but for" cause of the loss, but did not distinguish between the "but for" cause of the loss and the proximate cause of the loss. *Id.* Instead, the District Court treated proximate cause and "but for" cause as identical. *Id.* Thinking that "but for" cause and proximate cause are synonymous, the District Court concluded that the loss was proximately caused by the failure of the bilge pumps because the failure of the bilge pumps was the "last event in time" and because the loss would not have occurred "but for" the failure of the bilge pumps. *Id.*

Before turning to the caselaw, it might clarify the District Court's error by expressing that error in the form of a syllogism:

- Major Premise: All "but for" causes are proximate causes.
- Minor Premise: IAG has shown that the failure of the bilge pumps was a "but for" cause of the loss.
- Conclusion: Therefore, IAG has carried the burden of showing that the failure of the bilge pumps was the proximate cause of the loss.

It is the District Court's Major Premise which is faulty, and it is this faulty premise which naturally led to a faulty conclusion. Under the applicable caselaw, analyzed below, the correct syllogism is this:

- Major Premise: Not all "but for" causes are proximate causes.
- Minor Premise: IAG has only shown that the failure of the bilge pumps was the "but for" cause of the loss.
- Conclusion: Therefore, IAG has failed to carry the burden of showing that the failure of the bilge pumps was the proximate cause of the loss.

In addition, there is one further error to note in the District Court's logic: the failure of the bilge pumps was not even the only "but for" cause of the loss.  While the failure of the bilge pumps was one "but for" cause of the loss, the holes in the coil were also a "but for" cause of the loss.  As made clear by the testimony of Hebert, the water entering through the coil was also necessary for the loss to occur. DE#57, p. 20.  "But for" the corroded holes in the coil, water would not have entered the vessel.  *Id.*  "As long as" there were no holes in the coil allowing water to enter the vessel, the inoperable bilge pumps presented no risk of sinking.  *Id.* This means that the inoperable bilge pumps and the corroded holes in the cooling coil were both "but for" causes of the loss because both events had to occur in order to bring about this sinking.  *Id.*  Therefore, as a matter of simple logic, merely identifying the failed bilge pumps as the "but for" cause of the loss does not distinguish between other "but for" causes and does not establish that the failure of the bilge pumps was the proximate cause.[8]

For this precise reason, the caselaw commands that, where a loss is occasioned by two concurrent causes, the court must look past "but for" cause and

---

[8] It is also interesting to note that no less reliable a source than *Black's Law Dictionary* even states that "but for" cause is only an element of proximate cause. *Black's Law Dictionary*, Thomson Reuters, 10th ed. (2014).  It defines "but for cause" as "[t]he cause without which the event could not have occurred."  But it defines proximate cause as "[a] cause that directly produces an event and without which the event could not have occurred."  This definition makes clear that proximate cause has two components.  Just like "but for" cause, the proximate cause must be a cause "without which the event would not have occurred."  But, unlike "but for" cause, the proximate cause must also be "a cause that directly produces an event."  Although "but for" cause is a necessary condition of proximate cause, it is never a sufficient condition. *In re Flonase Antitrust Litig.*, 798 F.Supp.2d 619, 627 (E.D.Pa.2011), *Pedersen v. Kuhr*, 201 N.W.2d 711, 713 (Iowa.1972).

must determine which of those causes is proximate.  *See cases cited infra*.

However, the District Court failed to do this.  Instead, the District Court held that

the proximate cause of the sinking was the failure of the bilge pumps because the

failure of the bilge pumps was the "but for" cause of the sinking.  The caselaw

makes clear that this is reversible error.

When a vessel sinks at its dock, and the vessel's bilge pumps fail to keep the

water out, the caselaw is clear that the proximate cause of the loss is that which

caused the water to enter the vessel, not the failure of the bilge pumps to remove

the water from the vessel.  If the water entered the vessel due to a non-fortuitous or

excluded cause, then the policy provides no coverage for the loss.  For instance, the

*J & A Fleeting* case concerned a vessel which sank overnight at its dock after an

interruption of shoreside power caused the bilge pumps to cease operating.  *J & A*

*Fleeting, Inc. v. Fireman's Fund McGee Marine Underwriters*,  2006 A.M.C. 535

(E.D.Ky.2006).  In its zeal to distinguish the facts of the *J & A Fleeting* case, the

District Court declared that the interruption of shoreside power in that case was

purely speculative.  DE#104, p. 18.  Therefore, the District Court reasoned, the

facts of the *J & A Fleeting* case made it inapplicable in the present matter.  *Id*.

However, the problem with the District Court's attempt to distinguish the *J & A*

*Fleeting* case is this: the District Court's recitation of the facts is demonstrably

wrong.  In *J & A Fleeting*, it was undisputed that water entered the vessel due to a

failure in the vessel's shaft alley, but that the operation of the vessel's bilge pumps initially removed the water and prevented the vessel from sinking. *Id*, at 537. The insurer denied coverage based on evidence that water entered the vessel due to the insured's own lack of due diligence in maintaining the vessel (a non-fortuitous cause) and that the loss was also due to specifically excluded wear and tear. *Id*. On summary judgment, the insured presented undisputed evidence that there occurred a malfunction in the vessel's electrical system which caused an interruption of shoreside power to the bilge pumps and argued that such interruption was the cause of loss because it "superseded" the non-fortuitous and excluded entry of water. *J & A Fleeting*, DE#18, p. 4. Just like the District Court in the present matter, the insured argued that this separate interruption of shoreside power was the proximate cause of the loss because the vessel would not have sunk "as long as" the bilge pumps were functioning. *Id*, at p. 5. This is simply "but for" causation. *Steele v. Stallion Rockies Ltd*, *supra*. The court in *J & A Fleeting* characterized the interruption of shoreside power as speculative because the evidence for the interruption was circumstantial; the expert testifying for the insured inferred that it must have occurred in order to explain the failure of the bilge pumps. *J & A Fleeting*, at 540. This is identical to the present case. DE#57, pp. 20, 30, and 31. IAG's witnesses have presented no evidence for an interruption of shoreside power apart from their supposition that it must have occurred in order

to explain the sinking. *Id*. However, even though the evidence in *J & A Fleeting* was mere inference, the fact was undisputed on summary judgment, just as it is on the present matter. *J & A Fleeting*, at 540. Nevertheless, even though the interruption of shoreside power was admitted to have occurred and to have been a "but for" cause of the loss, the court in *J & A Fleeting* rejected the insured's unfounded legal assertion that the interruption of shoreside power was the proximate cause of the loss. *Id*. Instead, the court held that the sinking was properly attributable to a non-fortuitous event: entry of water due to the insured's own failure to exercise due diligence to maintain the vessel. *Id*, at 540-41. Therefore, despite the District Court's mischaracterization of the facts, the *J & A Fleeting* case is factually indistinguishable from the present matter. *Id*. The *J & A Fleeting* case shows that, even where an interruption of shoreside power to the bilge pumps is a "but for" cause of the loss, the interruption of power is not the proximate cause. *Id*.

This Court reached the identical conclusion in the case of *Travelers v. Peddle*, which is identical to the present matter is every respect. 158 Fed.Appx. 248.[9] Although decisions published in the Federal Appendix are not binding

---

[9] The District Court claimed it could not apply the *Peddle* case because this Court's short decision affirming the judgment of the Southern District of Florida did not contain enough facts. DE#104, p. 19. However, National Union supplied the District Court with the lower court's opinion, as well as the summary judgment motions submitted by the parties which showed the undisputed facts relied upon by this Court. The District Court must have elected not to review those documents. DE#71-1. Even though the present case is factually identical to the *Peddle* case, the District Court could have defended its decision by refusing to be swayed by non-binding precedent. 11th Cir. Rule 36-2. However, the District Court did more than that. The District Court inaccurately claimed that it did

precedent, this Court's own decision involving an identical loss and identical policy language should be considered very persuasive.  11th Cir. Rule 36-2.  Just like the present matter, the *Peddle* case concerned a vessel which sank at its dock. *Peddle*, at 248.  Just like the present matter, the insurance policy at issue was an "all risks" policy which covered only fortuitous losses and which excluded coverage for losses resulting from wear and tear, gradual deterioration, and corrosion.  *Travelers v. Peddle*, DE#71-1, p. 3.[10]  On summary judgment, the insurer presented evidence that water entered the vessel through a red-brass-thread nipple which fed water into the vessel's air conditioning cooling coil, which failed due to erosion and general corrosion occurring over time.  *Id*, at 4.  In opposition, the insured presented the evidence of his own expert that the failure of the red-brass-thread nipple was not caused by corrosion, but solely by "erosion," a cause of loss not specifically named among the policy's exclusions.  *Id*, at 5.  Just like the present matter, the insured's witness opined that the erosion was caused by high velocity water and particles of debris (such as sand and shells) which passed through the red-brass-thread nipple.  *Id*.  In addition, the insured even presented undisputed evidence that the vessel's three bilge pumps were operational at the time of the loss and that those pumps, singly or in combination, were adequate to

---

not have sufficient facts to determine the applicability of the *Peddle* case.  The District Court's docket shows that this is plainly untrue.
[10] Citations to the district court proceedings in the *Peddle* case are made by reference to the documents which were filed with the District Court in the present matter.

remove the water entering through the eroded red-brass-thread nipple. *Id*, at 3.

Therefore, the insured's theory of the loss, based on the undisputed testimony of

experts, was identical to the argument made by IAG: (1) Water entered the vessel

through holes caused by "erosion" (which is not specifically excluded). *Travelers*

*v. Peddle*, DE#71-2, p. 5. (2) The water was removed by the vessel's bilge pumps,

which were more than adequate to keep the vessel from sinking. *Id*. (3) An

interruption of shoreside power caused the vessel's bilge pumps to draw electricity

from the vessel's batteries. *Id*. Finally, (4) the bilge pumps ceased to function

when the batteries became depleted and the vessel then sank. *Id*.

Even though it was undisputed that an interruption of shoreside power did

occur, the district court gave summary judgment to the insurer, finding that there

was no dispute of fact that the proximate cause of the loss was the intrusion of

water through the eroded and deteriorated red-brass-thread nipple. DE#71-1, p. 7.

Even though the policy did not use the specific word "erosion," the district court

held that such losses are not fortuitous and are also barred by the policy's

exclusions for wear and tear, gradual deterioration, and corrosion. *Id*. On appeal,

the insured tried to argue that "corrosion" and "erosion" are different phenomenon

and that the failure to specifically exclude "erosion" meant there was coverage for

the loss. *Travelers v. Peddle*, 158 Fed.Appx. 248. However, this Court rejected

that contention and affirmed the decision of the district court. *Id*. Since the facts

of the present matter are identical to the facts of *Peddle*, there seems to be no compelling reason for this Court to ignore its own prior decision.

Other cases not involving an interruption of shoreside power also demonstrate that, where a vessel sinks, the proximate cause is the cause which allows the water to enter the vessel, not some other "but for" cause which may have contributed. For instance, the case of *Continental Ins. Co. v. Lone Eagle Shipping (Liber.)*, involved a vessel which was lost at sea during heavy weather. 952 F.Supp. 1046; 1997 AMC 1099 (S.D.N.Y.1997), *aff'd*, 134 F.3d 103; 1998 AMC 964 (2nd Cir.1998), citing *Lanasa Fruit Steamship & Importing Co. v. Universal Ins. Co.*, 302 U.S. 556 (1938), *Kitma As v. Royal Ins. Co.*, 9 P.3d 239; 2001 AMC 708 (Wn.App.2000).[11] After a trial, the following facts were established: (1) the sea conditions were a Force 9 on the Beaufort scale. (*Id*, at 1056) and (2) substantial portions of the hull were corroded and such corrosion existed before the loss of the vessel on December 26th, 1993 (*Id*, at 1058).[12] Based on these facts the district court concluded that the weather was sufficiently severe to be fortuitous and that the severe weather was a "but for" cause of the loss. *Id*, at

---

[11] The policy at issue in the *Lone Eagle* case was a "named perils" policy, not an "all risks" policy. *Id*. However, caselaw dealing with "named perils" policies are relevant to this analysis because a "named perils" policy includes the same requirement that the insured show that a fortuitous event was the proximate cause of the loss. *Id*. Losses proximately caused by corrosion are not fortuitous, no matter what type of policy. *Id*.

[12] In this case, the trial was not held to determine proximate cause. *Id*. Rather, there were factual disputes as to whether the insured exercised due diligence to maintain the vessel, whether the vessel met the requirements of its classification society, and the severity of the weather. *Id*, at 1053-56. However, once these factual disputes were resolved, the court determined proximate cause as a matter of law. *Id*, at 1062. It is for this reason that the district court's decision in *Lone Eagle*, identifying corrosion as the proximate cause of the loss, is relevant to the present matter and supports National Union's contention that it is entitled to summary judgment on the issues of proximate cause and corrosion. *Id*.

1062.  However, the district court found that merely showing "but for" cause was not adequate to prove, as a matter of law, that the fortuitous weather was the proximate cause of the loss.  *Id*, at 1062.  Instead, since the weather was nothing more than a "but for" cause of the loss, the proximate cause of the sinking was the "loss of structural strength due to wastage by corrosion."  *Id*, at 1058.  The corroded hull was the proximate cause of the loss because "the weather encountered on December 26 was not a determining factor, but rather merely revealed the weakness of the structure."  *Id* at 1058.

In the present case, IAG's vessel was structurally weak due to the corrosion of the coil.  The interruption of shoreside power merely revealed that weakness.

Instead of applying the factual relevant caselaw (*J & A Fleeting*, *Peddle*, and *Continental*), the District Court based its proximate cause decision exclusively on the case of *Weber v. New Hampshire Ins. Co.*, a Florida state case not cited by either of the parties.    480 So.2d 672; 1986 A.M.C. 2378 (Fla.App.1985).  Superficially, the *Weber* case and the present matter are quite similar.  The *Weber* case began like the present matter, with a vessel which sank at its dock.  *Id*, at 673.  Like the present matter, the policy was an "all risks" policy of marine insurance.  *Id*.  Neither party was able to ascertain the cause of the intrusion of water, but it was undisputed that the bilge pump suffered a separate failure due to a latent defect in the float switch.  *Id*, at 674.  In addition, it was undisputed that the capacity of

the bilge pump was greater than the rate of water flow into the vessel.  *Id*.

Therefore, just like the present case, the failure of the bilge pump was a "but for"

cause of the loss.  *Id*.  Based on these facts, the court did not hold that the failure of

the bilge pumps was the proximate cause of the loss or that the failure of the bilge

pumps was fortuitous.  Rather, the court held that the "[the insured's] claim is

within the coverage offered by the Inchmaree clause."  *Id*, at 675.

There is no such provision in National Union's policy.

The District Court overlooked this one critical, indeed dispositive difference

between the *Weber* case and the present case; the court in *Weber* found coverage

under a clause which does not exist in the present policy, an *Inchmaree* clause.  *Id*,

at 673.  Due to the operation of this clause, the court in *Weber* did not find that the

failure of bilge pumps was the proximate cause of the loss or that a loss caused

thereby was a fortuitous event.  *Id*.  Rather, the court in *Weber* found coverage

under a clause specifically developed by the marine insurance industry in order to

broaden coverage for losses not ordinarily covered by "all risks" policies of marine

insurance.  *Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042; 1979

A.M.C. 2534, *Northwestern Mut. Life Ins. Co. v. Linard*, 498 F.2d 556, 563; 1974

A.M.C. 877 (2nd Cir.1974), *Allen N. Spooner & Son, Inc. v. Connecticut Fire

Insurance Co.*, 314 F.2d 753, 757; 1963 A.M.C. 859 (2nd Cir.1963), *Int'l Ship

Repair & Marine Servs., Inc.*, 944 F.Supp. 886, 893; 1997 A.M.C. 1419

*IAG v. National Union Fire Insurance*
15-14406-FF

(S.D.Fla.1996), *Thames and Mersey Marine Ins. Co. v. Hamilton Fraser & Co.*, 12

App.Cas. 484 (House of Lords, 1887).   Under an *Inchmaree* clause, where the

cause of the intrusion of water is not ascertained, the loss is presumed to have been

proximately caused by "a peril of the sea," unless the insurer can show that the

insured failed to exercise due diligence to maintain the seaworthiness of the vessel.

*Weber*, at 674, *Couch on Insurance*, §99:27, footnote 1, (3rd ed.2015), *Williston on*

*Contracts*, §49:28 (4th ed.2015).[13]

Applying this special clause, the *Weber* court did not find that the failure of

the bilge pump was the proximate cause of the loss or that the failure of the bilge

pump was covered by the "all risks" portion of the policy of marine insurance.  *Id*.

There was no evidence at all that the intrusion of water was proximately caused by

a fortuitous event.  *Id*.  Since the cause of the intrusion of water was unascertained,

the insured could not show that the intrusion of water was proximately caused by a

fortuitous event and could not claim coverage under the "all risks" portion of the

policy.  *Id*.  Instead, it was the separate coverage of the *Inchmaree* clause which

triggered the presumption that some unidentified fortuitous peril of the sea was the

proximate cause of the intrusion of water.  *Id*.  With that presumption in place,

---

[13] *See also*, the *Tropical* case, in which a vessel sank without known cause.  *Tropical Marine Products, Inc. v. Birmingham Fire Insurance Co. of Pennsylvania*, 247 F.2d 116, 121; 1957 A.M.C. 1946 (5th Cir.1957).  Unlike the present case, "The Court found... no explanation as to what caused the leak.  And all are unanimous that it was and could not be determined." *Id*.  Fortunately for the insured, the policy contained an *Inchmaree* clause.  *Id*, at 119. Therefore, since the cause of the intrusion of water was a total mystery, the insured was entitled to the presumption that the intrusion of water was caused by a fortuitous peril of the sea and the burden shifted to the insurer to show that the insured failed to exercise due diligence to maintain the vessel.  *Id*, at 123.

there was no longer any question that the intrusion of water was proximately caused by a fortuitous event. *Id.* The only question before the court in *Weber* was whether the concurrent failure of the bilge pumps was caused by a latent defect and whether the insured exercised due diligence to maintain the seaworthiness of the vessel. *Id*, Leslie J. Buglass, *Marine Insurance and General Average in the United States: An Average Adjuster's Point of View*, pp. 149-151, 3rd ed. (Cornell Maritime Press, 1991). Since the insured was able to show the exercise of due diligence, the loss was held to be covered by the *Inchmaree* clause. *Weber*, at 675.

Once it is understood that the decision in *Weber* was based entirely on the special rules applicable to an *Inchmaree* clause, the District Court's mistaken reliance on *Weber* becomes manifest and requires reversal. The absence of an *Inchmaree* clause from the present policy means that every legal burden and presumption is different from that which determined the outcome of the *Weber* case. First, even if the present policy had an *Inchmaree* clause, the clause would not be triggered because the cause of the intrusion of water in the present matter is not unknown. It is undisputed that the water entered due to the corrosion of the coil. DE#50-14, p. 21, DE#73-1, p. 3, DE#73-2, p. 2. The undisputed facts show that "erosion/impingement attack" is merely another word for "corrosion," and corrosion is not fortuitous and is specifically excluded from coverage. *See cases*

39

*cited infra*.  Second, because there is no *Inchmaree* clause, IAG is not entitled to

the presumption that water entered the vessel due to a fortuitous peril of the sea.

*Weber*, *supra*.  Third, because there is no such presumption, no burden shifts to

National Union to show that IAG failed to exercise due diligence.  *Id*.  Once those

false presumptions are removed, all that is left in the present matter is the

undisputed evidence that water entered the vessel through the holes in the corroded

coil, which is both non-fortuitous and specifically excluded from coverage.

DE#55, pp. 3, 33, and 58, DE#55-3, p. 1, DE#50-14, p. 21, DE#73-1, p. 3, DE#73-

2, p. 2.  Although the interruption of shoreside power to the bilge pumps was

certainly a "but for" cause of the loss, the sinking is proximately attributable to the

entry of water through the corroded coil.  *Peddle*, *J & A Fleeting*, *Lone Eagle*,

*supra*.

Having misunderstood the undisputed evidence and the applicable caselaw,

the District Court improperly held that the interruption of shoreside power to the

bilge pumps was the proximate cause of the loss because it was the last event

before the loss and was the "but for" cause of the loss.  This confusion is precisely

what the caselaw forbids.  Instead of following that caselaw, the District Court

based its decision on an irrelevant case which had nothing to do with proximate

cause and which turned on a type of coverage not applicable in the present matter,

an *Inchmaree* clause.  *Weber*, *supra*.  Based on the applicable caselaw, even

*IAG v. National Union Fire Insurance*
15-14406-FF

though the failure of the bilge pumps was a necessary condition for the sinking to occur, the proximate cause of the sinking was still the entrance of sea water due to the corrosion of the coil.

Furthermore, the District Court's error is brought into stark relief when compared to the *Lone Eagle* decision. In that case, the court held that the fortuitous heavy weather was not the proximate cause of the loss, but "merely revealed the [preexisting] weakness of the vessel." *Lone Eagle*, at 1058. The exact same thing is true in the present case. Long before the interruption of shoreside power, water was entering the *It's All Good* through a "weakness of the vessel," the corroded coil. DE#50-4, DE#50-10, p. 5, DE#55, pp. 3, 33, and 58, DE#55-3, p. 1, DE#50-14, p. 21, DE#73-1, p. 3, DE#73-2, p. 2. IAG's witnesses can use the phrase "erosion/impingement attack," but their own undisputed testimony establishes that "erosion/impingement attack" is really just "corrosion." *Id*. A source as unimpeachable as the dictionary confirms that "erosion/impingement attack" is just another word for "corrosion." *Collins English Dictionary*. This corrosion, a "weakness of the vessel," was revealed when the bilge pumps ceased to function. DE#50-4, DE#50-10, p. 5, DE#55, pp. 3, 33, and 58, DE#55-3, p. 1, DE#50-14, p. 21, DE#73-1, p. 3, DE#73-2, p. 2. Although the failure of the bilge pumps was certainly necessary for the corroded coil to reveal itself, the loss is still proximately attributable to the "weakness of the

41

*IAG v. National Union Fire Insurance*
15-14406-FF

vessel," the corroded coil. *See cases cited supra.* Since corrosion is both non-

fortuitous and specifically excluded from coverage, the sinking of the *It's All Good*

cannot be covered, even under an "all risks" policy of marine insurance.

> 3. Notwithstanding *Lamadrid*, there is no coverage for a loss caused by corrosion, no matter how quickly that corrosion occurs, because corrosion is a non-fortuitous cause of loss and is specifically excluded.

Having established as an undisputed fact that the coil failed due to corrosion,

and having demonstrated that the loss was proximately caused by the entry of

water through the corroded coil, all that remains is the simple matter of reviewing

the caselaw which deals with corrosion. That caselaw shows that corrosion is a

non-fortuitous cause of loss which is specifically excluded, and that the District

Court's reliance on *Lamadrid* was badly misplaced. 567 Fed.Appx. 695 For

instance, the *Lago Canyon* case dealt with a vessel which sank due to a corroded

hose barb. *St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.*, 2009 WL

4855484 (S.D.Fla.2009), *aff'd*, 419 Fed.Appx. 946 (11th Cir.2011). The

undisputed evidence showed that the hose barb corroded due to the use of yellow

brass, which was a manufacturer's defect covered by the policy. *Id*, at 1.

Nonetheless, that manufacturer's defect led to corrosion, a type of loss which is not

fortuitous and which is specifically excluded from coverage. *St. Paul Fire and*

*Marine Ins. Co. v. Lago Canyon, Inc.*, 2008 A.M.C. 1617 (S.D.Fla.2008).

Therefore, following remand from the 11th Circuit, the Southern District of Florida

held that the loss was not fortuitous and was excluded from coverage because the loss was proximately caused by the corroded hose barb. *Lago Canyon*, 2009 WL 4855484, p. 7.

Similarly, the *Resmondo* case involved a one-year-old vessel which sank at its dock immediately after it was purchased. *Resmondo*, at 2604. Post-incident investigation revealed that the vessel suffered a grounding sometime before it was purchased and that the grounding caused a gimbal ring to be exposed to salt water. *Id*, at 2606. Once exposed, the gimbal ring corroded and caused water to enter the vessel. *Id*. Therefore, the district court held that (1) the loss was proximately caused by the corrosion of the gimbal ring, even though the exposure of the gimbal ring to salt water was caused by the prior grounding, and that (2) the loss was not fortuitous and was specifically excluded from coverage. *Id*, at 2601 and 2616.

To give another example, the *Central* case concerned an "all risks" policy of marine insurance covering a shipment of galvanized steel from Spain to the West Indies. *Central Int'l Co. v. Kemper Nat'l Ins. Co.*, 202 F.3d 372, 2000 AMC 751. En route, the vessel encountered heavy seas and was damaged. *Id*, at 373. When the vessel arrived at its destination, it was found that the steel was badly discolored and corroded. *Id*. The policy insuring the steel specifically excluded coverage for loss due to "discoloration and corrosion." *Id*, at 373. On summary judgment, it was undisputed that the cargo of steel was exposed to improperly loaded soda ash

*IAG v. National Union Fire Insurance*
15-14406-FF

and sea water which caused the steel to corrode. *Id*. Nevertheless, even though the loss was partly attributable to the fortuity of heavy seas and improper stowage, the First Circuit held that the loss was proximately caused by corrosion and was therefore not covered. *Id*, at 376.

Finally, as already analyzed more fully above, this Court dealt with an identical situation in the *Peddle* case and found that the entrance of water into the vessel through a corroded part was not covered, even though the interruption of shoreside electricity was a "but for" cause of the loss. *Peddle*, *supra*.

In the present case, the District Court ignored all the relevant caselaw dealing with corrosion and instead chose to rely on this Court's recent decision in the case of *Lamadrid v. National Union Fire Ins. Co.*, 567 Fed.Appx. 695. The *Lamadrid* case involved a vessel which suffered extensive engine damage due to a valve which became stuck. *Id*, at, 696. The vessel was covered by an "all risks" policy of marine insurance. *Id*. Following an investigation, neither sides' surveyor could determine what caused the valve to become stuck. *Id*, at 696-697. Unlike the present coil, which the parties agree failed due to corrosion, the cause of the stuck valve remained a total mystery. *Id*. On summary judgment, the district court held that the loss was not covered because the insured had failed to show that the failure of the valve was caused by a fortuitous event. *Id*, at 698. On appeal, this Court held that the insured met the burden of demonstrating a fortuitous loss "by

presenting expert testimony on the cause of the engine's failure, namely the failure of the relief valve, and by establishing that the ***unexplained*** loss occurred well before the end of the engine's projected lifespan."  *Id*, at 701-702 [emphasis added].  This Court did not hold that all premature failures were fortuitous.  *Id*. Rather, this Court held that where the cause of the loss was "unexplained," the insured could show fortuity by showing that the loss occurred prematurely.  *Id*. Therefore, since it was unknown what caused the relief valve to stick, the insured showed a fortuitous cause by showing that the valve failed only 750 hours into its expected lifespan of 2,500-3,500 hours.  *Id*.

There are two dispositive reasons why *Lamadrid* requires entry of judgment for National Union.  First, as demonstrated above, there is no evidence whatsoever that the corrosion of the coil occurred earlier than expected.  On the contrary, the undisputed evidence from Biery is that the corrosion of the coil after six years of use is perfectly reasonable and unsurprising.   Since there is no evidence of premature failure, the *Lamadrid* decision requires reversal.

Second, and even more importantly, the rule of law which decided the *Lamadrid* case only applies to "unexplained" losses.  *Id*, at 701-702.  It does not apply where the cause of the loss is known.  Even if the present coil did corrode prematurely, the rule of law which decided the *Lamadrid* case does not apply where the cause of loss is known to be corrosion.  In cases of corrosion, the

45

applicable caselaw holds that corrosion is not a covered cause of loss, no matter

when or how fast it occurs.  No matter how unexpected it may be and no matter

how fast it may occur, losses due to corrosion are not covered.  *Arkwright–Boston*

*Mfrs. v. Wausau Paper Mills Co.*, 818 F.2d 591, 595 (7th Cir.1987), *Pioneer Chlor*

*Alkali Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 863 F.Supp. 1226, 1236

(D.Nev.1994), *Gilbane Bldg. Co. v. The Altman Co.*, 2005 WL 534906, at *5

(Ohio.App.2005).

   For instance, the *Arkwright-Boston* case dealt with an "all risks" policy of

insurance covering a chemical reactor.  *Arkwright-Boston*, at 592.  The policy

specifically excluded losses caused by corrosion.  *Id*.  After several years of

operation, the reactor began to suffer damage due to the condensation of sulfuric

acid.  *Id*, at 593.  The presence of the acid caused the walls of the reactor to

corrode.  *Id*.  On summary judgment, the insured argued that the policy's corrosion

exclusion was ambiguous and that it should be limited to gradual corrosion, not the

sudden corrosion caused by "acid attack."  *Id*, at 594.  The Seventh Circuit rejected

this argument and specifically held that "we find that the speed at which the

corrosion took place here is not relevant to whether it falls under the corrosion

exclusion.  [The insured's] position that the corrosion exclusion covers only

inevitable and 'expected end-of-life failure to all metal' is not a reasonable

interpretation of the policy." *Id*, at 595. Even though the corrosion happened suddenly due to "acid attack," the corrosion was still excluded from coverage. *Id*.

To give another example, the *Central* case, already discussed above, dealt with a cargo of steel which became corroded. *Central*, at 374. Immediately upon leaving port, the vessel encountered heavy seas and the cargo of pristine steel was exposed to salt water and soda ash. *Central Int'l Co. v. Kemper Natl. Ins. Co.*, 1999 A.M.C. 1652, 1653 (D.Mass.1999). When the vessel reached its destination a mere three weeks later, the cargo of steel was already ruined by corrosion. *Central Int'l Co. v. Kemper Natl. Ins. Co.*, 1999 WL 34826456 (Appellant's Brief, 1999). On appeal before the First Circuit, the insured argued that the policy's corrosion exclusion only applied to corrosion naturally occurring from exposure to salt air, and not to the immediate corrosion caused by the combination of salt water and soda ash. *Central*, at 375. The First Circuit rejected this argument and held that the use of the word "corrosion" encompassed all manner of corrosion, not just slow forming corrosion. *Id*. Therefore, coverage for the immediate corrosion caused by exposure to combined salt water and soda ash was barred by the policy's corrosion exclusion. *Id*.

The unmistakable import of the caselaw is this: even if the corrosion of the coil were premature, that is irrelevant because corrosion is not fortuitous and is specifically excluded from coverage. In the present case, there is nothing in the

*IAG v. National Union Fire Insurance*
15-14406-FF

policy which gives any indication that the coverage of the policy includes "premature" corrosion. On the contrary, the policy uses the language which is common throughout the marine insurance industry. The policy covers "accidental, direct physical loss or damage, except as specifically excluded in this policy" and excludes from coverage "loss or resulting damage from... f. corrosion, except electrolytic (stray current) corrosion." Doc 50-1, p. 5. By its own terms, the policy only covers fortuities and bars coverage for all corrosion, exception for "electrolytic (stray current) corrosion." *Id*. No matter how soon or fast it may have occurred, the undisputed evidence shows that the holes in the coil were caused by corrosion. Therefore, as the holes in the coil were the proximate cause of the intrusion of water, there can be no coverage for the loss.

## <u>CONCLUSION</u>

The District Court's most serious error was confusing the "but for" cause of the loss with "proximate" cause of the loss. Since proximate cause is more than mere "but for" cause, a court must look past the "but for" cause in order to identify the proximate or efficient cause. A court must apply "common sense" to identify the underlying cause which sets other causes in motion. *Commodities Reserve Co. v. St. Paul Fire & Marine Ins. Co.*, 879 F.2d 640, 643; 1989 A.M.C. 2409, *U.S. Fire Insurance Co. v. Cavanaugh*, 732 F.2d 832, 836; 1985 A.M.C. 1001, *Blaine Richards & Co. v. Marine Indemnity Ins. Co.*, 635 F.2d 1051, 1054-55; 1981

48

*IAG v. National Union Fire Insurance*
15-14406-FF

A.M.C. 1, *Tillery v. Hull & Co. Inc.*, 717 F.Supp. 1481, 1484.  A court must identify the underlying weakness of the vessel, and distinguish that weakness from the other factors which merely reveal the weakness.  *Continental*, at 1058.  Where a vessel sinks, the caselaw requires that a court must look to the cause of the intrusion of water, and not merely to the cause of the failure of the bilge pumps to remove the water.  *Peddle*, *J & A Fleeting*, and *Continental*, *supra*.  Instead of doing all this, the District Court looked only at the last event in time and concluded that the interruption of shoreside power was the proximate cause of the loss because the loss would not have occurred "but for" the interruption of shoreside power.  DE#104.  Worse, the District Court based its decision entirely on a single state court case, *Weber*, which turned on a special type of coverage not part of the present policy, an *Inchmaree* clause.  *Id*.  This is reversible error.

Next, the District Court badly misunderstood the very narrow holding of the *Lamadrid* case.  By its own terms, the *Lamadrid* decision only applies to "unexplained" mechanical breakdowns.  *Lamadrid*, at 701-702.  Yet, the present case is not one in which the vessel suffered an "unexplained" mechanical breakdown.  Rather, all the parties agree that that water entered the vessel through holes in the air conditioning cooling coil caused by corrosion.  The caselaw addressing corrosion is clear that corrosion is not fortuitous and is specifically

49

excluded from coverage, no matter how soon or how fast it may occur.  This is reversible error.

Finally, the District Court compounded these errors my mistaking the most basic facts of the present case.  Searching for evidence that the coil failed prematurely, the District Court confused the sump pump with the bilge pumps and confused wear and tear with corrosion.  Even if the *Lamadrid* standard were erroneously applied to this case, there is no evidence that the coil corroded prematurely.  This, also, is reversible error.

Once the District Court's factual errors are swept away, all the remains is the simple fact that water entered the vessel through the corroded coil.  Although the interruption of shoreside power was necessary for the bilge pumps to fail, that failure merely exposed the underlying weakness of the vessel.  This Court has already addressed this exact scenario and held that there is no coverage for such a loss. *Peddle*, *supra*.

WHEREFORE, National Union asks that this Court reverse the decision of the District Court, order judgment in favor of National Union, and award all such further relief as may be appropriate.

*IAG v. National Union Fire Insurance*
15-14406-FF

November 10th, 2015


GOLDMAN & HELLMAN

Attorneys for Plaintiff/Appellant

233 Harvard St., Suite 211

Brookline, MA 02446

Tel – (617)566-4200

Fax – (617)566-4292

Cel – (617)320-9854


By: /s/ Michael I. Goldman

MICHAEL I. GOLDMAN, ESQ.

MA. BAR NO. 677362

GOLDMAN & HELLMAN

Attorneys for Plaintiff/Appellant

800 S.E. 3rd Avenue, 4th Floor

Fort Lauderdale, FL 33316

Tel – (954) 356-0460

Fax – (954) 832-0878

Cel – (617) 784-1100


By: /s/ Steven E. Goldman

STEVEN E. GOLDMAN, ESQ.

FLA. BAR NO. 345210

51

*IAG v. National Union Fire Insurance*
15-14406-FF

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 13,653 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).


GOLDMAN & HELLMAN                    GOLDMAN & HELLMAN
Attorneys for Plaintiff/Appellant       Attorneys for Plaintiff/Appellant
233 Harvard St., Suite 211             800 S.E. 3rd Avenue, 4th Floor
Brookline, MA 02446                  Fort Lauderdale, FL 33316
Tel – (617)566-4200                   Tel – (954) 356-0460
Fax – (617)566-4292                   Fax – (954) 832-0878
Cel – (617)320-9854                   Cel – (617) 784-1100


By: /s/ Michael I. Goldman            By: /s/ Steven E. Goldman
MICHAEL I. GOLDMAN, ESQ.           STEVEN E. GOLDMAN,ESQ.
MA. BAR NO. 677362                  FLA. BAR NO. 345210

*IAG v. National Union Fire Insurance*
15-14406-FF

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 10th, 2015 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

GOLDMAN & HELLMAN
Attorneys for Plaintiff/Appellant
233 Harvard St., Suite 211
Brookline, MA 02446
Tel – (617)566-4200
Fax – (617)566-4292
Cel – (617)320-9854

By: /s/ Michael I. Goldman
MICHAEL I. GOLDMAN, ESQ.
MA. BAR NO. 677362

GOLDMAN & HELLMAN
Attorneys for Plaintiff/Appellant
800 S.E. 3rd Avenue, 4th Floor
Fort Lauderdale, FL 33316
Tel – (954) 356-0460
Fax – (954) 832-0878
Cel – (617) 784-1100

By: /s/ Steven E. Goldman
STEVEN E. GOLDMAN, ESQ.
FLA. BAR NO. 345210